Justice Stevens
delivered the opinion of the Court.
The United States, the Republic of France, and 15 other Nations have acceded to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, opened for signature, Mar. 18, 1970, 23 U. S. T. 2555, T. I. A. S. No. 7444.[1] This Convention — sometimes referred to as the “Hague Convention” or the “Evidence Convention” — prescribes certain procedures by which a judicial authority in one contracting state may request evidence located in another contracting state. The question presented in this case concerns the extent to which a federal district court must employ the procedures set forth in the Convention when litigants seek answers to interrogatories, the production of documents, and admissions from a French adversary over whom the court has personal jurisdiction.
I — I
The two petitioners are corporations owned by the Republic of France.[2] They are engaged in the business of design *525 ing, manufacturing, and marketing aircraft. One of their planes, the “Rallye,” was allegedly advertised in American aviation publications as “the World’s safest and most economical STOL plane.”[3] On August 19, 1980, a Rallye crashed in Iowa, injuring the pilot and a passenger. Dennis Jones, John George, and Rosa George brought separate suits based upon this accident in the United States District Court for the Southern District of Iowa, alleging that petitioners had manufactured and sold a defective plane and that they were guilty of negligence and breach of warranty. Petitioners answered the complaints, apparently without questioning the jurisdiction of the District Court. With the parties’ consent, the cases were consolidated and referred to a Magistrate. See 28 U. S. C. § 636(c)(1).
Initial discovery was conducted by both sides pursuant to the Federal Rules of Civil Procedure without objection.[4] When plaintiffs[5] served a second request for the production of documents pursuant to Rule 34, a set of interrogatories pursuant to Rule 33, and requests for admission pursuant to Rule 36, however, petitioners filed a motion for a protective order. App. 27-37. The motion alleged that because petitioners are “French corporations, and the discovery sought *526 can only be found in a foreign state, namely France,” the Hague Convention dictated the exclusive procedures that must be followed for pretrial discovery. App. 2. In addition, the motion stated that under French penal law, the petitioners could not respond to discovery requests that did not comply with the Convention. Ibid.[6]
The Magistrate denied the motion insofar as it related to answering interrogatories, producing documents, and making admissions.[7] After reviewing the relevant cases, the Magistrate explained:
“To permit the Hague Evidence Convention to override the Federal Rules of Civil Procedure would frustrate the courts’ interests, which particularly arise in products li *527 ability cases, in protecting United States citizens from harmful products and in compensating them for injuries arising from use of such products.” App. to Pet. for Cert. 25a.
The Magistrate made two responses to petitioners’ argument that they could not comply with the discovery requests without violating French penal law. Noting that the law was originally “ ‘inspired to impede enforcement of United States antitrust laws,”’[8] and that it did not appear to have been strictly enforced in France, he first questioned whether it would be construed to apply to the pretrial discovery requests at issue.[9] Id., at 22a-24a. Second, he balanced the interests in the “protection of United States citizens from harmful foreign products and compensation for injuries caused by such products” against France’s interest in protecting its citizens “from intrusive foreign discovery procedures.” The Magistrate concluded that the former interests were stronger, particularly because compliance with the requested discovery will “not have to take place in France” and ■will not be greatly intrusive or abusive. Id., at 23a-25a.
Petitioners sought a writ of mandamus from the Court of Appeals for the Eighth Circuit under Federal Rule of Appellate Procedure 21(a). Although immediate appellate review of an interlocutory discovery order is not ordinarily available, see Kerr v. United States District Court, 426 U. S. 394, *528 402-403 (1976), the Court of Appeals considered that the novelty and the importance of the question presented, and the likelihood of its recurrence, made consideration of the merits of the petition appropriate. 782 F. 2d 120 (1986). It then held that “when the district court has jurisdiction over a foreign litigant the Hague Convention does not apply to the production of evidence in that litigant’s possession, even though the documents and information sought may physically be located within the territory of a foreign signatory to the Convention.” Id., at 124. The Court of Appeals disagreed with petitioners’ argument that this construction would render the entire Hague Convention “meaningless,” noting that it would still serve the purpose of providing an improved procedure for obtaining evidence from nonparties. Id., at 125. The court also rejected petitioners’ contention that considerations of international comity required plaintiffs to resort to Hague Convention procedures as an initial matter (“first use”), and correspondingly to invoke the federal discovery rules only if the treaty procedures turned out to be futile. The Court of Appeals believed that the potential overruling of foreign tribunals’ denial of discovery would do more to defeat than to promote international comity. Id., at 125-126. Finally, the Court of Appeals concluded that objections based on the French penal statute should be considered in two stages: first, whether the discovery order was proper even though compliance may require petitioners to violate French law; and second, what sanctions, if any, should be imposed if petitioners are unable to comply. The Court of Appeals held that the Magistrate properly answered the first question and that it was premature to address the second.[10] The court *529 therefore denied the petition for mandamus. We granted certiorari. 476 U. S. 1168 (1986).
HH HH
In the District Court and the Court of Appeals, petitioners contended that the Hague Evidence Convention “provides the exclusive and mandatory procedures for obtaining documents and information located within the territory of a foreign signatory.” 782 F. 2d, at 124.[11] We are satisfied that the Court of Appeals correctly rejected this extreme position. We believe it is foreclosed by the plain language of the Convention. Before discussing the text of the Convention, however, we briefly review its history.
The Hague Conference on Private International Law, an association of sovereign states, has been conducting periodic sessions since 1893. S. Exec. Doc. A, 92d Cong., 2d Sess., p. v (1972) (S. Exec. Doc. A). The United States participated in those sessions as an observer in 1956 and 1960, and as a member beginning in 1964 pursuant to congressional authorization.[12] In that year Congress amended the Judicial Code to grant foreign litigants, without any requirement of reciprocity, special assistance in obtaining evidence in the *530 United States.[13] In 1965 the Hague Conference adopted a Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (Service Convention), 20 U. S. T. 361, T. I. A. S. No. 6638, to which the Senate gave its advice and consent in 1967. The favorable response to the Service Convention, coupled with the longstanding interest of American lawyers in improving procedures for obtaining evidence abroad, motivated the United States to take the initiative in proposing that an evidence convention be adopted. Statement of Carl F. Salans, Deputy Legal Adviser, Department of State, Convention on Taking of Evidence Abroad, S. Exec. Rep. No. 92-25, p. 3 (1972). The Conference organized a special commission to prepare the draft convention, and the draft was approved without a dissenting vote on October 26, 1968. S. Exec. Doc. A, p. v. It was signed on behalf of the United States in 1970 and ratified by a unanimous vote of the Senate in 1972.[14] The Convention’s purpose was to establish a system for obtaining evidence located abroad that would be “tolerable” to the state executing the request and would produce evidence “utilizable” in the requesting state. Amram, Explanatory Report on the Convention on the Taking of Evi *531 dence Abroad in Civil or Commercial Matters, in S. Exec. Doc. A, p. 11.
In his letter of transmittal recommending ratification of the Convention, the President noted that it was “supported by such national legal organizations as the American Bar Association, the Judicial Conference of the United States, the National Conference, of Commissions on Uniform State Laws, and by a number of State, local, and specialized bar associations.” S. Exec. Doc. A, p. hi. There is no evidence of any opposition to the Convention in any of those organizations. The Convention was fairly summarized in the Secretary of State’s letter of submittal to the President:
“The willingness of the Conference to proceed promptly with work on the evidence convention is perhaps attributable in large measure to the difficulties encountered by courts and lawyers in obtaining evidence abroad from countries with markedly different legal systems. Some countries have insisted on the exclusive use of the complicated, dilatory and expensive system of letters rogatory or letters of request. Other countries have refused adequate judicial assistance because of the absence of a treaty or convention regulating the matter. The substantial increase in litigation with foreign aspects arising, in part, from the unparalleled expansion of international trade and travel in recent decades had intensified the need for an effective international agreement to set up a model system to bridge differences between the common law and civil law approaches to the taking of evidence abroad.
“Civil law countries tend to concentrate on commissions rogatoires, while common law countries take testimony on notice, by stipulation and through commissions to consuls or commissioners. Letters of request for judicial assistance from courts abroad in securing needed evidence have been the exception, rather than the rule. The civil law technique results normally in a résumé of *532 the evidence, prepared by the executing judge and signed by the witness, while the common law technique results normally in a verbatim transcript of the witness’s testimony certified by the reporter.
“Failure by either the requesting state or the state of execution fully to take into account the differences of approach to the taking of evidence abroad under the two systems and the absence of agreed standards applicable to letters of request have frequently caused difficulties for courts and litigants. To minimize such difficulties in the future, the enclosed convention, which consists of a preamble and forty-two articles, is designed to:
“1. Make the employment of letters of request a principal means of obtaining evidence abroad;
“2. Improve the means of securing evidence abroad by increasing the powers of consuls and by introducing in the civil law world, on a limited basis, the concept of the commissioner;
“3. Provide means for securing evidence in the form needed by the court where the action is pending; and
“4. Preserve all more favorable and less restrictive practices arising from internal law, internal rules of procedure and bilateral or multilateral conventions.
“What the convention does is to provide a set of minimum standards with which contracting states agree to comply. Further, through articles 27, 28 and 32, it provides a flexible framework within which any future liberalizing changes in policy and tradition in any country with respect to international judicial cooperation may be translated into effective change in international procedures. At the same time it recognizes and preserves procedures of every country which now or hereafter may provide international cooperation in the taking of evidence on more liberal and less restrictive bases, whether this is effected by supplementary agreements or by municipal law and practice.” Id., p. vi.
*533 rH b-H u-j
In arguing their entitlement to a protective order, petitioners correctly assert that both the discovery rules set forth in the Federal Rules of Civil Procedure and the Hague Convention are the law of the United States. Brief for Petitioners 31. This observation, however, does not dispose of the question before us; we must analyze the interaction between these two bodies of federal law. Initially, we note that at least four different interpretations of the relationship between the federal discovery rules and the Hague Convention are possible. Two of these interpretations assume that the Hague Convention by its terms dictates the extent to which it supplants normal discovery rules. First, the Hague Convention might be read as requiring its use to the exclusion of any other discovery procedures whenever evidence located abroad is sought for use in an American court. Second, the Hague Convention might be interpreted to require first, but not exclusive, use of its procedures. Two other interpretations assume that international comity, rather than the obligations created by the treaty, should guide judicial resort to the Hague Convention. Third, then, the Convention might be viewed as establishing a supplemental set of discovery procedures, strictly optional under treaty law, to which concerns of comity nevertheless require first resort by American courts in all cases. Fourth, the treaty may be viewed as an undertaking among sovereigns to facilitate discovery to which an American court should resort when it deems that course of action appropriate, after considering the situations of the parties before it as well as the interests of the concerned foreign state.
In interpreting an international treaty, we are mindful that it is “in the nature of a contract between nations,” Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U. S. 243, 253 (1984), to which “[gjeneral rules of construction apply.” Id., at 262. See Ware v. Hylton, 3 Dall. 199, 240-241 (1796) *534 (opinion of Chase, J.). We therefore begin “with the text of the treaty and the context in which the written words are used.” Air France v. Saks, 470 U. S. 392, 397 (1985). The treaty’s history, “‘the negotiations, and the practical construction adopted by the parties’ ” may also be relevant. Id., at 396 (quoting Choctaw Nation of Indians v. United States, 318 U. S. 423, 431-432 (1943)).
We reject the first two of the possible interpretations as inconsistent with the language and negotiating history of the Hague Convention. The preamble of the Convention specifies its purpose “to facilitate the transmission and execution of Letters of Request” and to “improve mutual judicial cooperation in civil or commercial matters.” 23 U. S. T., at 2557, T. I. A. S. No. 7444. The preamble does not speak in mandatory terms which would purport to describe the procedures for all permissible transnational discovery and exclude all other existing practices.[15] The text of the Evidence Convention itself does not modify the law of any contracting state, require any contracting state to use the Convention procedures, either in requesting evidence or in responding to such requests, or compel any contracting state to change its own evidence-gathering procedures.[16]
*535 The Convention contains three chapters. Chapter I, entitled “Letters of Requests,” and chapter II, entitled “Taking of Evidence by Diplomatic Officers, Consular Agents and Commissioners,” both use permissive rather than mandatory language. Thus, Article 1 provides that a judicial authority in one contracting state “may” forward a letter of request to the competent authority in another contracting state for the purpose of obtaining evidence.[17] Similarly, Articles 15, 16, and 17 provide that diplomatic officers, consular agents, and commissioners “may . . . without compulsion,” take evidence under certain conditions.[18] The absence of any command that a contracting state must use Convention procedures when they are not needed is conspicuous.[19]
*536 Two of the Articles in chapter III, entitled “General Clauses,” buttress our conclusion that the Convention was intended as a permissive supplement, not a pre-emptive replacement, for other means of obtaining evidence located abroad.[20] Article 23 expressly authorizes a contracting state to declare that it will not execute any letter of request in aid of pretrial discovery of documents in a common-law country.[21] Surely, if the Convention had been intended to replace completely the broad discovery powers that the common-law courts in the United States previously exercised over foreign litigants subject to their jurisdiction, it would have been most anomalous for the common-law contracting parties to agree to *537 Article 23, which enables a contracting party to revoke its consent to the treaty’s procedures for pretrial discovery.[22] In the absence of explicit textual support, we are unable to accept the hypothesis that the common-law contracting states abjured recourse to all pre-existing discovery procedures at the same time that they accepted the possibility that a contracting party could unilaterally abrogate even the Convention’s procedures.[23] Moreover, Article 27 plainly states that *538 the Convention does not prevent a contracting state from using more liberal methods of rendering evidence than those authorized by the Convention.[24] Thus, the text of the Evidence Convention, as well as the history of its proposal and ratification by the United States, unambiguously supports the conclusion that it was intended to establish optional procedures that would facilitate the taking of evidence abroad. See Amram, The Proposed Convention on the Taking of Evidence Abroad, 55 A. B. A. J. 651, 655 (1969); President’s Letter of Transmittal, Sen. Exec. Doc. A, p. hi.
*539 An interpretation of the Hague Convention as the exclusive means for obtaining evidence located abroad would effectively subject every American court hearing a case involving a national of a contracting state to the internal laws of that state. Interrogatories and document requests are staples of international commercial litigation, no less than of other suits, yet a rule of exclusivity would subordinate the court’s supervision of even the most routine of these pretrial proceedings to the actions or, equally, to the inactions of foreign judicial authorities. As the Court of Appeals for the Fifth Circuit observed in In re Anschuetz & Co., GmbH, 754 F. 2d 602, 612 (1985), cert. pending, No. 85-98:
“It seems patently obvious that if the Convention were interpreted as preempting interrogatories and document requests, the Convention would really be much more than an agreement on taking evidence abroad. Instead, the Convention would amount to a major regulation of the overall conduct of litigation between nationals of different signatory states, raising a significant possibility of very serious interference with the jurisdiction of United States courts.
“While it is conceivable that the United States could enter into a treaty giving other signatories control over litigation instituted and pursued in American courts, a treaty intended to bring about such a curtailment of the rights given to all litigants by the federal rules would surely state its intention clearly and precisely identify crucial terms.”
The Hague Convention, however, contains no such plain statement of a pre-emptive intent. We conclude accordingly that the Hague Convention did not deprive the District Court of the jurisdiction it otherwise possessed to order a foreign *540 national party before it to produce evidence physically located within a signatory nation.[25]
IV
While the Hague Convention does not divest the District Court of jurisdiction to order discovery under the Federal Rules of Civil Procedure, the optional character of the Convention procedures sheds light on one aspect of the Court of Appeals’ opinion that we consider erroneous. That court concluded that the Convention simply “does not apply” to discovery sought from a foreign litigant that is subject to the jurisdiction of an American court. 782 F. 2d, at 124. Plaintiffs argue that this conclusion is supported by two considerations. First, the Federal Rules of Civil Procedure provide *541 ample means for obtaining discovery from parties who are subject to the court’s jurisdiction, while before the Convention was ratified it was often extremely difficult, if not impossible, to obtain evidence from nonparty witnesses abroad. Plaintiffs contend that it is appropriate to construe the Convention as applying only in the area in which improvement was badly needed. Second, when a litigant is subject to the jurisdiction of the district court, arguably the evidence it is required to produce is not “abroad” within the meaning of the Convention, even though it is in fact located in a foreign country at the time of the discovery request and even though it will have to be gathered or otherwise prepared abroad. See In re Anschuetz & Co., GmbH, 754 F. 2d, at 611; In re Messerschmitt Bolkow Blohm GmbH, 757 F. 2d 729, 731 (CA5 1985), cert. vacated, 476 U. S. 1168 (1986); Daimler-Benz Aktiengesellschaft v. United States District Court, 805 F. 2d 340, 341-342 (CA10 1986).
Nevertheless, the text of the Convention draws no distinction between evidence obtained from third parties and that obtained from the litigants themselves; nor does it purport to draw any sharp line between evidence that is “abroad” and evidence that is within the control of a party subject to the jurisdiction of the requesting court. Thus, it appears clear to us that the optional Convention procedures are available whenever they will facilitate the gathering of evidence by the means authorized in the Convention. Although these procedures are not mandatory, the Hague Convention does “apply” to the production of evidence in a litigant’s possession in the sense that it is one method of seeking evidence that a court may elect to employ. See Briefs of Amici Curiae for the United States and the SEC 9-10, the Federal Republic of Germany 5-6, the Republic of France 8-12, and the Government of the United Kingdom and Northern Ireland 8.
y
Petitioners contend that even if the Hague Convention’s procedures are not mandatory, this Court should adopt a rule *542 requiring that American litigants first resort to those procedures before initiating any discovery pursuant to the normal methods of the Federal Rules of Civil Procedure. See, e. g., Laker Airways, Ltd. v. Pan American World Airways, 103 F. R. D. 42 (DC 1984); Philadelphia Gear Corp. v. American Pfauter Corp., 100 F. R. D. 58 (ED Pa. 1983). The Court of Appeals rejected this argument because it was convinced that an American court’s order ultimately requiring discovery that a foreign court had refused under Convention procedures would constitute “the greatest insult” to the sovereignty of that tribunal. 782 F. 2d, at 125-126. We disagree with the Court of Appeals’ view. It is well known that the scope of American discovery is often significantly broader than is permitted in other jurisdictions, and we are satisfied that foreign tribunals will recognize that the final decision on the evidence to be used in litigation conducted in American courts must be made by those courts. We therefore do not believe that an American court should refuse to make use of Convention procedures because of a concern that it may ultimately find it necessary to order the production of evidence that a foreign tribunal permitted a party to withhold.
Nevertheless, we cannot accept petitioners’ invitation to announce a new rule of law that would require first resort to Convention procedures whenever discovery is sought from a foreign litigant. Assuming, without deciding, that we have the lawmaking power to do so, we are convinced that such a general rule would be unwise. In many situations the Letter of Request procedure authorized by the Convention would be unduly time consuming and expensive, as well as less certain to produce needed evidence than direct use of the Federal Rules.[26] A rule of first resort in all cases would *543 therefore be inconsistent with the overriding interest in the “just, speedy, and inexpensive determination” of litigation in our courts. See Fed. Rule Civ. Proc. 1.
Petitioners argue that a rule of first resort is necessary to accord respect to the sovereignty of states in which evidence is located. It is true that the process of obtaining evidence in a civil-law jurisdiction is normally conducted by a judicial officer rather than by private attorneys. Petitioners contend that if performed on French soil, for example, by an unauthorized person, such evidence-gathering might violate the “judicial sovereignty” of the host nation. Because it is only through the Convention that civil-law nations have given their consent to evidence-gathering activities within their borders, petitioners argue, we have a duty to employ those procedures whenever they are available. Brief for Petitioners 27-28. We find that argument unpersuasive. If such a duty were to be inferred from the adoption of the Convention itself, we believe it would have been described in the text of that document. Moreover, the concept of international comity[27] requires in this context a more particularized analysis of *544 the respective interests of the foreign nation and the requesting nation than petitioners’ proposed general rule would generate.[28] We therefore decline to hold as a blanket matter that comity requires resort to Hague Evidence Convention procedures without prior scrutiny in each case of the particular facts, sovereign interests, and likelihood that resort to those procedures will prove effective.[29]
*545 Some discovery procedures are much more “intrusive” than others. In this case, for example, an interrogatory asking petitioners to identify the pilots who flew flight tests in the Rallye before it was certified for flight by the Federal Aviation Administration, or a request to admit that petitioners authorized certain advertising in a particular magazine, is certainly less intrusive than a request to produce all of the “design specifications, line drawings and engineering plans and all engineering change orders and plans and all drawings concerning the leading edge slats for the Rallye type aircraft manufactured by the Defendants.” App. 29. Even if a court might be persuaded that a particular document request was too burdensome or too “intrusive” to be granted in full, with or without an appropriate protective order, it might well refuse to insist upon the use of Convention procedures *546 before requiring responses to simple interrogatories or requests for admissions. The exact line between reasonableness and unreasonableness in each case must be drawn by the trial court, based on its knowledge of the case and of the claims and interests of the parties and the governments whose statutes and policies they invoke.
American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position. Judicial supervision of discovery should always seek to minimize its costs and inconvenience and to prevent improper uses of discovery requests. When it is necessary to seek evidence abroad, however, the district court must supervise pretrial proceedings particularly closely to prevent discovery abuses. For example, the additional cost of transportation of documents or witnesses to or from foreign locations may increase the danger that discovery may be sought for the improper purpose of motivating settlement, rather than finding relevant and probative evidence. Objections to “abusive” discovery that foreign litigants advance should therefore receive the most careful consideration. In addition, we have long recognized the demands of comity in suits involving foreign states, either as parties or as sovereigns with a coordinate interest in the litigation. See Hilton v. Guyot, 159 U. S. 113 (1895). American courts should therefore take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state. We do not articulate specific rules to guide this delicate task of adjudication.[30]
*547 I — I >
In the case before us, the Magistrate and the Court of Appeals correctly refused to grant the broad protective order, that petitioners requested. The Court of Appeals erred, however, in stating that the Evidence Convention does not apply to the pending discovery demands. This holding may be read as indicating that the Convention procedures are not even an option that is open to the District Court. It must be recalled, however, that the Convention’s specification of duties in executing states creates corresponding rights in requesting states; holding that the Convention does not apply in this situation would deprive domestic litigants of access to evidence through treaty procedures to which the contracting states have assented. Moreover, such a rule would deny the foreign litigant a full and fair opportunity to demonstrate appropriate reasons for employing Convention procedures in the first instance, for some aspects of the discovery process.
Accordingly, the judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

 The Hague Convention entered into force between the United States and France on October 6, 1974. The Convention is also in force in Barbados, Cyprus, Czechoslovakia, Denmark, Finland, the Federal Republic of Germany, Israel, Italy, Luxembourg, the Netherlands, Norway, Portugal, Singapore, Sweden, and the United Kingdom. Office of the Legal Adviser, United States Dept, of State, Treaties in Force 261-262 (1986).

 Petitioner Soeiété Nationale Industrielle Aérospatiale is wholly owned by the Government of France. Petitioner Soeiété de Construction d’Avions *525 de Tourisme is a wholly owned subsidiary of Soeiété Nationale Industrielle Aérospatiale.

 App. 22, 24. The term “STOL,” an acronym for “short takeoff and landing,” “refers to a fixed-wing aircraft that either takes off or lands with only a short horizontal run of the aircraft.” Douglas v. United States, 206 Ct. Cl. 96, 99, 510 F. 2d 364, 365, cert. denied, 423 U. S. 825 (1975).

 Plaintiffs made certain requests for the production of documents pursuant to Rule 34(b) and for admissions pursuant to Rule 36. App. 19-23. Apparently the petitioners responded to those requests without objection, at least insofar as they called for material or information that was located in the United States. App. to Pet. for Cert. 12a. In turn, petitioners deposed witnesses and parties pursuant to Rule 26, and served interrogatories pursuant to Rule 33 and a request for the production of documents pursuant to Rule 34. App. 13. Plaintiffs complied with those requests.

 Although the District Court is the nominal respondent in this mandamus proceeding, plaintiffs are the real respondent parties in interest.

 Article 1A of the French “blocking statute,” French Penal Code Law No. 80-538, provides:
“Subject to treaties or international agreements and applicable laws and regulations, it is prohibited for any party to request, seek or disclose, in writing, orally or otherwise, economic, commercial, industrial, financial or technical documents or information leading to the constitution of evidence with a view to foreign judicial or administrative proceedings or in connection therewith.
“Art. ler bis. — Sous réserve des traités ou accords internationaux et des lois et réglements en vigueur, il est interdit a toute personne de demander, de rechercher ou de communiquer, par écrit, oralement ou sous toute autre forme, des documents ou renseignements d’ordre économique, commercial, industriel, financier ou technique tendant á la constitution de preuves en vue de procédures judiciaires ou administratives étrangéres ou dans le cadre de celles-ci.”
Article 2 provides:
“The parties mentioned in [Article 1A] shall forthwith inform the competent minister if they receive any request concerning such disclosures.
“Art. 2. Les personnes visées aux articles ler et ler bis sont tenues d’informer sans délai le ministre compétent lorsqu’elles se trouvent saisies de toute demande concernant de telles communications.” App. to Pet. for Cert. 47a-50a.

 Id., at 25a. The Magistrate stated, however, that if oral depositions were to be taken in France, he would require compliance with the Hague Evidence Convention. Ibid.

 His quotation was from Toms, The French Response to Extraterritorial Application of United States Antitrust Laws, 15 Int’l Law. 585, 586 (1981).

 He relied on a passage in the Toms article stating that “the legislative history [of the Law] shows only that the Law was adopted to protect French interests from abusive foreign discovery procedures and excessive assertions of extraterritorial jurisdiction. Nowhere is there an indication that the Law was to impede litigation preparations by French companies, either for their own defense or to institute lawsuits abroad to protect their interests, and arguably such applications were unintended.” App. to Pet. for Cert. 22a-23a (citing Toms, supra, at 598).

 “The record before this court does not indicate whether the Petitioners have notified the appropriate French Minister of the requested discovery in accordance with Article 2 of the French Blocking Statute, or whether the Petitioners have attempted to secure a waiver of prosecution from the French government. Because the Petitioners are corporations owned by *529 the Republic of France, they stand in a most advantageous position to receive such a waiver. However, these issues will only be relevant should the Petitioners fail to comply with the magistrate’s discovery order, and we need not presently address them.” 782 F. 2d, at 127.

 The Republic of France likewise takes the following position in this ease:
“THE HAGUE CONVENTION IS THE EXCLUSIVE MEANS OF DISCOVERY IN TRANSNATIONAL LITIGATION AMONG THE CONVENTION’S SIGNATORIES UNLESS THE SOVEREIGN ON WHOSE TERRITORY DISCOVERY IS TO OCCUR CHOOSES OTHERWISE.” Brief for Republic of France as Amicus Curiae 4.

 See S. Exec. Doc. A, p. v; Pub. L. 88-244, 77 Stat. 775 (1963).

 As the Rapporteur for the session of the Hague Conference which produced the Hague Evidence Convention stated: “In 1964 Rule 28(b) of the Federal Rules of Civil Procedure and 28 U. S. C. §§ 1781 and 1782 were amended to offer to foreign countries and litigants, without a requirement of reciprocity, wide judicial assistance on a unilateral basis for the obtaining of evidence in the United States. The amendments named the Department of State as a conduit for the receipt and transmission of letters of request. They authorized the use in the federal courts of evidence taken abroad in civil law countries, even if its form did not comply with the conventional formalities of our normal rules of evidence. No country in the world has a more open and enlightened policy.” Amram, The Proposed Convention on the Taking of Evidence Abroad, 55 A. B. A. J. 651 (1969).

 118 Cong. Rec. 20623 (1972).

The Hague Conference on Private International Law’s omission of mandatory language in the preamble is particularly significant in light of the same body’s use of mandatory language in the preamble to the Hague Service Convention, 20 U. S. T. 361, T. I. A. S. No. 6638. Article 1 of the Service Convention provides: “The present Convention shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad.” Id., at 362, T. I. A. S. No. 6638. As noted, supra, at 530, the Service Convention was drafted before the Evidence Convention, and its language provided a model exclusivity provision that the drafters of the Evidence Convention could easily have followed had they been so inclined. Given this background, the drafters’ election to use permissive language instead is strong evidence of their intent.

 At the time the Convention was drafted, Federal Rule of Civil Procedure 28(b) clearly authorized the taking of evidence on notice either in ae- *535 cordance with the laws of the foreign country or in pursuance of the law of the United States.

 The first paragraph of Article 1 reads as follows:
“In civil or commercial matters a judicial authority of a Contracting State may, in accordance with the provisions of the law of that State, request the competent authority of another Contracting State, by means of a Letter of Request, to obtain evidence, or to perform some other judicial act.” 23 U. S. T., at 2557, T. I. A. S. 7444.

 Thus, Article 17 provides:
“In a civil or commercial matter, a person duly appointed as a commissioner for the purpose may, without compulsion, take evidence in the territory of a Contracting State in aid of proceedings commenced in the courts of another Contracting State if—
“(a) a competent authority designated by the State where the evidence is to be taken has given its permission either generally or in the particular case; and
“(b) he complies with the conditions which the competent authority has specified in the permission.
“A Contracting State may declare that evidence may be taken under this Article without its prior permission.” Id,., at 2565, T. I. A. S. 7444.

 Our conclusion is confirmed by the position of the Executive Branch and the Securities and Exchange Commission, which interpret the “language, history, and purposes” of the Hague Convention as indicating “that it was not intended to prescribe the exclusive means by which American plaintiffs might obtain foreign evidence.” Brief for United States as Ami-cus Curiae 9 (citation omitted). “[T]he meaning attributed to treaty pro *536 visions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.” Sumitomo Shoji America, Inc. v. Avagliano, 457 U. S. 176, 184-185 (1982); see also O’Connor v. United States, 479 U. S. 27, 33 (1986). As a member of the United States delegation to the Hague Conference concluded:
“[The Convention] makes no major changes in United States procedure and requires no major changes in United States legislation or rules. On the other front, it will give the United States courts and litigants abroad enormous aid by providing an international agreement for the taking of testimony, the absence of which has created barriers to our courts and litigants.” Amram, Explanatory Report on the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, S. Exec. Doc. A, at pp. 1, 3.

 In addition to the Eighth Circuit, other Courts of Appeals and the West Virginia Supreme Court have held that the Convention cannot be viewed as the exclusive means of securing discovery transnationally. See Société Nationale Industrielle Aérospatiale v. United States District Court, 788 F. 2d 1408, 1410 (CA9 1986); In re Messerschmitt Bolkow Blohm GmbH, 757 F. 2d 729, 731 (CA5 1985), cert. vacated, 476 U. S. 1168 (1986); In re Anschuetz & Co., GmbH, 754 F. 2d 602, 606-615, and n. 7 (CA5 1985), cert. pending, No. 85-98; Gebr. Eickhoff Maschinenfabrik und Eisengieberei mbH v. Starcher, - W. Va. -, -, 328 S. E. 2d 492, 497-501 (1985).

 Article 23 provides:
“A Contracting State may at the time of signature, ratification or accession, declare that it will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries.” 23 U. S. T., at 2568, T. I. A. S. 7444.

 Thirteen of the seventeen signatory states have made declarations under Article 23 of the Convention that restrict pretrial discovery of documents. See 7 Martindale-Hubbell Law Directory (pt. VII) 15-19 (1986).

 “The great object of an international agreement is to define the common ground between sovereign nations. Given the gulfs of language, culture, and values that separate nations, it is essential in international agreements for the parties to make explicit their common ground on the most rudimentary of matters.” Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U. S. 243, 262 (1984) (Stevens, J., dissenting). The utter absence in the Hague Convention of an exclusivity provision has an obvious explanation: The contracting states did not agree that its procedures were to be exclusive. The words of the treaty delineate the extent of their agreement; without prejudice to their existing rights and practices, they bound themselves to comply with any request for judicial assistance that did comply with the treaty’s procedures. See Carter, Obtaining Foreign Discovery and Evidence for Use in Litigation in the United States: Existing Rules and Procedures, 13 Int’l Law. 5, 11, n. 14 (1979) (common-law nations and civil-law jurisdictions have separate traditions of bilateral judicial cooperation; the Evidence Convention “attempts to bridge” the two traditions.)
The separate opinion reasons that the Convention procedures are not optional because unless other signatory states “had expected the Convention to provide the normal channels for discovery, [they] would have had no incentive to agree to its terms.” Post, at 550. We find the treaty language that the parties have agreed upon and ratified a surer indication of their intentions than the separate opinion’s hypothesis about the expectations of the parties. Both comity and concern for the separation of powers counsel the utmost restraint in attributing motives to sovereign states which have bargained as equals. Indeed, Justice Blackmun notes that “the Convention represents a political determination — one that, consistent with the principle of separation of powers, courts should not attempt to second guess.” Post, at 552. Moreover, it is important to remember that the *538 evidence-gathering procedures implemented by the Convention would still provide benefits to the signatory states even if the United States were not a party.

 Article 27 provides:
“The provisions of the present Convention shall not prevent a Contracting State from—
“(a) declaring that Letters of Request may be transmitted to its judicial authorities through channels other than those provided for in Article 2;
“(b) permitting, by internal law or practice, any act provided for in this Convention to be performed upon less restrictive conditions;
“(c) permitting, by internal law or practice, methods of taking evidence other than those provided for in this Convention.” 23 U. S. T., at 2569, T. I. A. S. 7444.
Thus, for example, the United Kingdom permits foreign litigants, by a letter of request, to “apply directly to the appropriate courts in the United Kingdom for judicial assistance” or to seek information directly from parties in the United Kingdom “if, as in this case, the court of origin exercises jurisdiction consistent with accepted norms of international law.” Brief for the Government of the United Kingdom and Northern Ireland as Ami-cus Curiae 6 (footnote omitted). On its face, the term “Contracting State” comprehends both the requesting state and the receiving state. Even if Article 27 is read to apply only to receiving states, see, e. g., Gebr. Eickhoff Maschinenfabrik und Eisengieberei mbH v. Starcher, - W. Va., at -, 328 S. E. 2d, at 499-500, n. 11 (rejecting argument that Article 27 authorizes more liberal discovery procedures by requesting as well as executing states), the treaty’s internal failure to authorize more liberal procedures for obtaining evidence would carry no pre-emptive meaning. We are unpersuaded that Article 27 supports a “negative inference” that would curtail the pre-existing authority of a state to obtain evidence in accord with its normal procedures.

 The opposite conclusion of exclusivity would create three unacceptable asymmetries. First, within any lawsuit between a national of the United States and a national of another contracting party, the foreign party could obtain discovery under the Federal Rules of Civil Procedure, while the domestic party would be required to resort first to the procedures of the Hague Convention. This imbalance would run counter to the fundamental maxim of discovery that “[mjutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation.” Hickman v. Taylor, 329 U. S. 495, 507 (1947).
Second, a rule of exclusivity would enable a company which is a citizen of another contracting state, to compete with a domestic company on uneven terms, since the foreign company would be subject to less extensive discovery procedures in the event that both companies were sued in an American court. Petitioners made a voluntary decision to market their products in the United States. They are entitled to compete on equal terms with other companies operating in this market. But since the District Court unquestionably has personal jurisdiction over petitioners, they are subject to the same legal constraints, including the burdens associated with American judicial procedures, as their American competitors. A general rule according foreign nationals a preferred position in pretrial proceedings in our courts would conflict with the principle of equal opportunity that governs the market they elected to enter.
Third, since a rule of first use of the Hague Convention would apply to cases in which a foreign party is a national of a contracting state, but not to cases in which a foreign party is a national of any other foreign state, the rule would confer an unwarranted advantage on some domestic litigants over others similarly situated.

 We observe, however, that in other instances a litigant’s first use of the Hague Convention procedures can be expected to yield more evidence abroad more promptly than use of the normal procedures governing pretrial civil discovery. In those instances, the calculations of the litigant will naturally lead to a first-use strategy.

 Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of eases touching the laws and interests of other sovereign states. This Court referred to the doctrine of comity among nations in Emory v. Grenough, 3 Dall. 369, 370, n. (1797) (dismissing appeal from judgment for failure to plead diversity of citizenship, but setting forth an extract from a treatise by Ulrich Huber (1636-1694), a Dutch jurist):
“ ‘By the courtesy of nations, whatever laws are carried into execution, within the limits of any government, are considered as having the same effect every where, so far as they do not occasion a prejudice to the rights of the other governments, or their citizens.
“ ‘[Njothing would be more inconvenient in the promiscuous intercourse and practice of mankind, than that what was valid by the laws of one place, should be rendered of no effect elsewhere, by a diversity of law. . . Ibid, (quoting 2 U. Huber, Praelectiones Juris Romani et hodiemi, bk. 1, tit. 3, pp. 26-31 (C. Thomas, L. Menke, & G. Gebauer eds. 1725)).
See also Hilton v. Guyot, 159 U. S. 113, 163-164 (1895):
“ ‘Comity,’ in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But *544 it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.”

 The nature of the concerns that guide a comity analysis is suggested by the Restatement of Foreign Relations Law of the United States (Revised) §437(l)(c) (Tent. Draft No. 7, 1986) (approved May 14, 1986) (Restatement). While we recognize that § 437 of the Restatement may not represent a consensus of international views on the scope of the district court’s power to order foreign discovery in the face of objections by foreign states, these factors are relevant to any comity analysis:
“(1) the importance to the . . . litigation of the documents or other information requested;
“(2) the degree of specificity of the request;
“(3) whether the information originated in the United States;
“(4) the availability of alternative means of securing the information; and
“(5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.” Ibid.

 The French “blocking statute,” n. 6, swpra, does not alter our conclusion. It is well settled that such statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute. See Societe Internationale Pour Participations Industrielles et Commerdales, S. A. v. Rogers, 357 U. S. 197, 204-206 (1958). Nor can the enactment of such a statute by a foreign nation require American courts to engraft a rule of first resort onto the Hague Convention, or otherwise to provide the nationals of such a country with a preferred status in our courts. It is clear that American courts are not required to adhere blindly to the directives of such a statute. Indeed, the language of the statute, if taken literally, would appear to represent an extraordinary exercise of legislative jurisdiction by the Republic of France over a United States district judge, forbidding him or her to order any discovery from a party of French nationality, even simple requests for admissions or interrogatories that the party *545 could respond to on the basis of personal knowledge. It would be particularly incongruous to recognize such a preference for corporations that are wholly owned by the enacting nation. Extraterritorial assertions of jurisdiction are not one-sided. While the District Court’s discovery orders arguably have some impact in France, the French blocking statute asserts similar authority over acts to take place in this country. The lesson of comity is that neither the discovery order nor the blocking statute can have the same omnipresent effect that it would have in a world of only one sovereign. The blocking statute thus is relevant to the court’s particularized comity analysis only to the extent that its terms and its enforcement identify the nature of the sovereign interests in nondisclosure of specific kinds of material.
The American Law Institute has summarized this interplay of blocking statutes and discovery orders: “[W]hen a state has jurisdiction to prescribe and its courts have jurisdiction to adjudicate, adjudication should (subject to generally applicable rules of evidence) take place on the basis of the best information available. . . . [Blocking] statutes that frustrate this goal need not be given the same deference by courts of the United States as substantive rules of law at variance with the law of the United States.” See Restatement §437, Reporter’s Note 5, pp. 41, 42. “On the other hand, the degree of friction created by discovery requests . . . and the differing perceptions of the acceptability of American-style discovery under national and international law, suggest some efforts to moderate the application abroad of U. S. procedural techniques, consistent with the overall principle of reasonableness in the exercise of jurisdiction.” Id., at 42.

 Under the Hague Convention, a letter of request must specify “the evidence to be obtained or other judicial act to be performed,” Art. 3, and must be in the language of the executing authority or be accompanied by a translation into that language. Art. 4, 23 U. S. T., at 2558-2559, T. I. A. S. 7444. Although the discovery request must be specific, the *547 party seeking discovery may find it difficult or impossible to determine in advance what evidence is within the control of the party urging resort to the Convention and which parts of that evidence may qualify for international judicial assistance under the Convention. This information, however, is presumably within the control of the producing party from which discovery is sought. The district court may therefore require, in appropriate situations, that this party bear the burden of providing translations and detailed descriptions of relevant documents that are needed to assure prompt and complete production pursuant to the terms of the Convention.